**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------X
                                          :
In re MERRILL LYNCH TYCO                   :
RESEARCH SECURITIES LITIGATION             :
                                          :
-----------------------------------------X
```
**OPINION AND ORDER**

03 Civ. 4080(JFK)

**APPEARANCES**

<u>For Class Plaintiffs:</u>

> LAW OFFICES OF BERNARD M. GROSS, P.C.
> 100 Penn Square East, Suite 450
> Philadelphia, Pennsylvania 19107
>     Of Counsel:   Deborah Gross, Esq.

> POMERANTZ, HAUDEK, BLOCK, GROSSMAN & GROSS, LLP
> 100 Park Avenue
> New York, New York 10017
>     Of Counsel:   Marc Gross, Esq.

> VIANALE & VIANALE, LLP
> 2499 Glades Road, Suite 112
> Boca Raton, Florida 33431
>     Of Counsel:   Kenneth Vianale, Esq.

<u>For Defendants:</u>

> HUGHES, HUBBARD & REED, LLP
> One Battery Park Plaza
> New York, New York 10004
>     Of Counsel:   Vicki Andreadis, Esq.

> SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
> Four Times Square
> New York, New York 10036
>     Of Counsel:   Jay Kasner, Esq.
>                   Scott Musoff, Esq.

**JOHN F. KEENAN, United States District Judge.**

**JOHN F. KEENAN, United States District Judge:**

This Opinion considers the petition of the lead plaintiffs for class certification and final approval of a proposed settlement and plan of allocation in this securities class action. The putative class members are direct purchasers of common stock in Tyco, who alleged that Merrill Lynch, through its star analyst, Phua Young, issued fraudulent research reports in which the defendants knowingly overvalued Tyco's worth and issued ill-advised "buy" or "hold" recommendations. As a result of the issuance of fraudulent research reports, the plaintiffs alleged that investors purchased shares of Tyco at an artificially inflated price and suffered financial losses when Merrill Lynch's misconduct was made public. The Court also considers counsels' application for an award of attorneys' fees and reimbursement of litigation expenses. For the reasons that follow, the Court (i) grants class certification to the settling plaintiffs, (ii) approves the settlement and plan of allocation, (iii) awards attorneys' fees in the amount of 22.5% of the settlement fund, and (iv) awards reimbursement of litigation expenses to counsel.

## BACKGROUND

On January 22, 2002 (the first day of the Class Period), Tyco announced that it was breaking up into four independent, publically-traded companies, retiring $11 billion in

debt, and selling off its subsidiary, CIT Group.  Subsequently,
Defendant Phua Young ("Young"), a well-known and very widely read
Merrill Lynch research analyst who covered Tyco, issued a series
of research reports in which Young "positively portrayed the
restructuring of Tyco, including the CIT-spin-off, while not
disclosing that Young believed the asset valuations were inflated
and questioned whether a sale of CIT would occur." (Declaration
of Deborah Gross ("Gross Decl.") ¶ 16.)  Despite his private
misgivings about Tyco's actual asset value and the prospects for
the CIT sale, Young recommended that investors either hold or
purchase Tyco stock.  On June 6, 2002 (the last day of the Class
Period), Merrill Lynch, through a different research analyst,
issued a report disclosing negative information about Tyco and
advising investors to reduce their holdings in Tyco.  After this
disclosure, Tyco's share price fell from $17.30 to $14.60.  As
counsel note, a number of other events that occurred around the
same time also could have contributed to the decline in Tyco's
share price.  Those events included the announcements that Tyco's
CEO, Dennis Kozlowski, had resigned for "personal reasons"; that
Tyco planned to take a $6 billion loss for its ultimate failure
to sell off its CIT Group; and that a governmental investigation
had been launched into Kozlowski's allegedly improper personal
use of Tyco's funds.

In April 2002, the Office of the New York Attorney
General (the "NYAG") announced that it had been conducting an
extensive investigation into Merrill Lynch's issuance of
allegedly false research reports.  In May 2002, the NYAG
announced that Merrill had agreed to a civil settlement of $100
million.  The Tyco Action was among numerous lawsuits brought
against Merrill Lynch in the wake of the NYAG's highly publicized
investigation of and settlement with Merrill Lynch.

The bulk of the actions against Merrill Lynch
originally were assigned to the late Honorable Milton J. Pollack
for pre-trial purposes, in In re Merrill Lynch & Co., Inc.
Research Reports Sec. Litig., 02 MDL 1484, pursuant to an order
of the Judicial Panel on Multidistrict Litigation ("MDL") which
consolidated before Judge Pollack numerous claims, alleging
securities fraud against Merrill Lynch and other defendants.  The
cases were reassigned to me upon Judge Pollack's death.  I have
presided over three global settlements of the cases consolidated
under the MDL (the "MDL Cases").  The first global settlement
involved three consolidated cases, relating to claims brought on
behalf of shareholders of three different Merrill Lynch
proprietary mutual funds (the "Mutual Fund Cases"), and was
approved by this Court on February 1, 2007. See In re Merrill
Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL 1484
(JFK), 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1, 2007) (the

"Mutual Fund Decision"). The second global settlement involved twenty consolidated cases, relating to claims brought on behalf of direct purchasers of stock in the Internet-based companies that were the subjects of Merrill Lynch's allegedly fraudulent reports (the "Internet Cases"), and was approved by the Court on September 5, 2007. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 02 MDL, 1484, 2007 U.S. Dist. LEXIS 65372 (S.D.N.Y. Sept. 5, 2007) (the "Internet Cases Decision"). The third global settlement involved one consolidated case, relating to claims brought on behalf of direct purchasers of Merrill Lynch's stock, who alleged that Merrill Lynch's research analysts gave materially misleading favorable ratings to a number of Internet-based stocks in order to generate business for Merrill Lynch's investment banking operation, and that the share value of Merrill Lynch's stock declined when the fraud was exposed (the "ML Shareholders Case"). That settlement was approved by the Court on December 20, 2007. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 02 MDL 1484, 2007 U.S. Dist. LEXIS 93423 (S.D.N.Y. Dec. 20, 2007) (the "ML Shareholders Decision"). Although the Tyco Action is not part of the multi-district litigation and thus has proceeded separately from the MDL Cases, the procedural posture and factual and legal bases for the claims in this case share much in common with the MDL Cases, and the similarities are important in determining the propriety of class

5

certification and final approval of the settlement, as well as the proper award of attorneys' fees.

*Procedural History*

This action commenced in June 2003 with the filing in the Southern District of New York of six putative class action complaints against Merrill Lynch and Young. By Order dated August 26, 2003, the related class actions were consolidated under the caption of the instant case and assigned to Judge Pollack. By the same Order, Ronald and Deborah Gutzwiller were named Lead Plaintiffs and the Law Offices of Bernard M. Gross, P.C. was appointed as Lead Counsel. On September 25, 2003, Lead Plaintiffs filed a consolidated amended complaint (the "Complaint") on behalf of individuals who purchased Tyco's common stock between January 22, 2002 and June 6, 2002, asserting claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, against Merrill Lynch, its broker-affiliate (Merrill Lynch Pierce Fenner & Smith, Inc.), and Young. The Complaint alleged, among other things, that the defendants wrote and published purportedly "independent" research reports on Tyco during the Class Period when, in fact, (i) the defendants had no reasonable basis for their opinions about Tyco's projected share price; (ii) the defendants were not independent in making their recommendations; (iii) the defendants failed to disclose that they actually held views about Tyco stock

that were contrary to the opinions expressed in the research
reports; and (iv) the defendants failed to disclose that the
falsely positive research reports were issued in order to benefit
Tyco, retain Tyco as a corporate client, and generate future
underwriting business with Tyco.  Plaintiffs claimed that the
defendants' misconduct caused Tyco's stock to become artificially
inflated, resulting in Plaintiff's financial losses when the
defendants' fraudulent conduct was revealed.

In November 2003, the defendants filed a motion to
dismiss the complaint, arguing that the plaintiffs had failed
adequately to plead loss causation, failed to plead fraud with
sufficient particularity, and failed to support a strong
inference of scienter regarding Young's and Merrill Lynch's
relationship with Tyco.  In February 2004, Judge Polack granted
the motion to dismiss with prejudice, holding that the complaint
failed adequately to plead loss causation and failed to plead
fraud with sufficient particularity.  In March 2004, Plaintiffs
filed a timely notice of appeal.  In May 2004, the defendants
moved to stay the appeal pending the Second Circuit's resolution
of the appeal of Judge Pollack's dismissal-with-prejudice of the
complaints in two "test cases" that had proceeded in the MDL
Cases.  Plaintiffs opposed the stay, and the Second Circuit
denied Defendants' motion to stay the appeal.  The parties
briefed the appeal and oral argument was scheduled for February

2005.  Shortly thereafter, the Second Circuit granted Defendants'
request to adjourn oral argument until after the Second Circuit
had adjudicated the "test cases."  On January 20, 2005, the
Second Circuit issued its opinion in <u>Lentell v. Merrill Lynch</u>,
396 F.3d 161 (2d Cir. 2005), affirming Judge Pollack's dismissal-
with-prejudice of the "test cases" on loss causation grounds.

### *The Settlement*

Settlement discussions in this case began in the summer
of 2005, several months after the issuance of the Court of
Appeals decision in <u>Lentell</u>.  In 2006, the parties filed a
stipulation with the Second Circuit withdrawing the pending
appeal from active consideration while the parties continued
settlement negotiations.

On June 19, 2007, the parties filed a proposed
Settlement Stipulation ("Stipulation").  On August 7, 2007, the
Court granted preliminary approval of the Stipulation
("Preliminary Order"), which among other things granted
preliminary certification to the settlement class and to the Lead
Plaintiffs as class representatives; set forth the deadlines for
notice to potential class members and the filing of objections
and requests for exclusion; set the date of a fairness hearing;
appointed Valley Forge Administrative Services ("VFAS") as claims
administrator to administer settlement proceeds and disseminate
notice of settlement to potential class members; and approved the

8

form and substance of the proposed notice of settlement and the proof of claim form.

The Stipulation provides for a cash payment in the amount of $4.9 million, plus interest ("Settlement Fund").[1]  The Settlement Class consists of persons who acquired Tyco common stock between January 22, 2002 and June 6, 2002, inclusively, and retained the stock at least until June 6, 2002 and suffered financial losses.  Plaintiffs' counsel request 25% of the Settlement Fund in attorneys' fees, amounting to approximately $1,225,000, plus interest.  Counsel also request $38,139.88 (as of January 9, 2008) as reimbursement for litigation expenses.

Pursuant to the Stipulation, the Settlement Fund will be used to pay taxes and tax expenses, attorneys' fees, and litigation expenses.  The remaining amount of the Settlement Fund ("Net Settlement Fund") then will be distributed to valid claimants pursuant to the Plan of Allocation.  The Stipulation also contains a release and waiver, barring any participating Class Members from bringing against the defendants any future claims, known or unknown, that arise out of or relate to this action.

_Notice to Class_

---

[1]As of January 9, 2008, approximately $90,000 of interest had accrued.

In August 2007, pursuant to the Preliminary Order, the court-approved claims administrator, VFAS, began mailing notice of the proposed settlement and proof of claim forms to potential class members. As of December 12, 2007, VFAS mailed a total of 604,687 notices. In addition, also pursuant to the Preliminary Order, summary notices describing the settlement were published in the USA Today and, electronically, on the PR Newswire, on October 31, 2007. VFAS also established a website that provided potential class members with downloadable versions of the notice and proof of claim forms, as well as information regarding class members' rights under the proposed settlement.

*Plan of Allocation*

The Plan of Allocation calls for the Settlement Fund, after payment of attorneys' fees and litigation costs, notification costs, and claims administration costs, to be distributed to class members who have submitted valid and timely proof of claims on a pro rata basis. The amount of distribution to each class member will depend on the number of Tyco shares purchased by that member and the timing of the purchase and sale of those shares. Each class member's recovery will depend upon that claimant's percentage of the total recognized claims of all class members who submitted timely and valid proof of claims.

*Reaction of Class to the Notice of Proposed Settlement*

_____The class has reacted favorably to the proposed settlement. As of the date of the Fairness Hearing, only twelve potential class members requested exclusion and only two objections to the proposed settlement were received.[2]

*Fairness Hearing*

Lead Counsel has submitted a Motion for Final Approval of Class Action Settlement. Class Counsel[3] have submitted a Motion on Class Counsel's Joint Application for Award of Counsel Fees and Reimbursement of Expenses, and accompanying memoranda and exhibits. Defendant has not submitted any papers.

A Fairness Hearing was held on January 8, 2008. Plaintiffs' counsel addressed the Court in support of the fairness of the proposed Settlement and Plan of Allocation, and in support of the application for attorneys' fees of 25% of the Settlement Fund. Counsel for Merrill Lynch also appeared at the Fairness Hearing but did not address argument to the Court. No Objectors attended the Hearing.

---

[2]At the Fairness Hearing, counsel noted that, of the twelve requests for exclusion that were filed, only three appeared to be filed by valid class members. However, counsel requested that the Court approve the exclusion of all twelve applicants for exclusion, and I granted the request.

[3]In addition to Lead Counsel (the Law Offices of Bernard M. Gross), the following counsel participated on behalf of the plaintiffs: Vianale & Vianale LLP; Berger & Montague, P.C.; and Pomerantz, Haudek, Block, Grossman & Gross, LLP (acting as local Liaison Counsel).

## DISCUSSION

### *(i) Certification of the Settlement Class*

The Stipulation contemplates certification of the settlement class. "Before certification is proper for any purpose–settlement, litigation, or otherwise–a court must ensure that the requirements of Rule 23(a) and (b) have been met." Denny v. Deutsche Bank, A.G., 443 F.3d 253, 270 (2d Cir. 2006). Rule 23(a) imposes four threshold requirements on putative class actions: numerosity, commonality, typicality, and adequacy of representation. Id. at 267. In addition, Rule 23(b)(3) imposes the following two requirements: "Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" Id. (quoting Fed. R. Civ. P. 23(b)(3)). The Court considers each requirement in turn.

*Numerosity*

Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). While no minimum number of plaintiffs is required for a suit to be maintained as a class action, "[g]enerally, courts will find a class sufficiently numerous when

it comprises 40 or more members." <u>DeMarco v. Nat'l Collector's</u> <u>Mint, Inc.</u>, 229 F.R.D. 73, 80 (S.D.N.Y. 2005) (citation and internal quotations omitted).  Here, VFAS identified more than 604,000 potential class members.  At the Fairness Hearing, Lead Counsel informed the Court that, as of January 9, 2008, approximately 83,000 claims had been filed.  The settlement class in this Action clearly is so large that individual actions by all potential plaintiffs would not be  possible.  The numerosity requirement therefore is easily satisfied.

*Commonality*

Under Rule 23(a)(2), class certification is appropriate where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The commonality requirement of Rule 23(a)(2) is satisfied if "all class members are in a substantially identical factual situation and the questions of law raised by the plaintiff[s] are applicable to each class member." <u>In re Playmobil Antitrust Litig.</u>, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998).  The rule does not require that every question of law or fact be common to each class member. <u>Id.</u>  "The commonality requirement has been applied permissively in the context of securities fraud litigation." <u>In re Veeco Instruments,</u> <u>Inc., Sec. Litig.,</u> 235 F.R.D. 220, 238 (S.D.N.Y. 2006).  The Tyco Action raises questions of law and fact that are common to each class member.  Plaintiffs are suing under the same federal

securities laws, alleging identical misrepresentations and/or
omissions of material statements by the defendants regarding
Tyco's stock, and alleging that the misrepresentations
artificially inflated the price of Tyco's stock, thereby
resulting in the plaintiffs' financial losses when the alleged
fraud was revealed.  Thus, "the success of each plaintiff's claim
turns on establishing the existence, nature and significance of
the same alleged misrepresentations and omissions." Id.  The
commonality requirement is satisfied.

*Typicality*

Rule 23(a)(3) is satisfied if "the claims or defenses
of the representative parties are typical of the claims or
defenses of the class." Fed. R. Civ. P. 23(a)(3).  The
"typicality" requirement is met where "the claims of the named
plaintiffs arise from the same practice or course of conduct that
gives rise to the claims of the proposed class members." Schwab
v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1104 (E.D.N.Y.
2006) (internal quotations and citation omitted).  Here, there is
no indication that the claims of the lead plaintiffs differ in
any respect from the claims of the rest of the putative class
members, apart from the amount of damages allegedly suffered by
each member of the class. "Differences in the damages sustained
by individual class members does not preclude a showing of
typicality, nor defeat class certification." In re Playmobil

14

Antitrust Litig., 35 F. Supp. at 242.  Thus, the typicality
requirement is satisfied.

*Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties
will fairly and adequately protect the interests of the class."
Fed. R. Civ. P. 23(a)(4).  This necessitates a two-part inquiry:
first, whether the lead plaintiffs' interests are antagonistic to
the interests of other members of the class, and second, whether
plaintiffs' attorneys are qualified, experienced and able to
conduct the litigation.  Baffa v. Donaldson, Lufkin & Jenrette
Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000).  Regarding the first
prong there is no indication that the lead plaintiffs' claims
conflict in any way with the claims of other class members.  As
stated above, the claims of the named plaintiffs appear to be
typical of the claims of the remainder of the class.  The second
prong also is satisfied.  It is clear from the firm resumes
submitted to the Court that counsel have ample experience in the
field of class securities litigation, and from the record of this
case it is evident that counsel represented the class adequately
and zealously for more than four years, and enabled the class to
obtain a favorable and certain cash recovery.  Thus, the final
requirement of Rule 23(a) has been met.

*Rule 23(b)(3):  Predomination and Superiority*

Rule 23(b)(3) requires "[1] that common questions of law or fact predominate over individual questions and [2] that a class action is superior to other methods of adjudication." <u>In re Veeco Instruments, Inc.</u>, 235 F.R.D. at 240. "In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." <u>In re Blech Sec. Litig.</u>, 187 F.R.D. 97, 107 (S.D.N.Y. 1999). Common questions also predominate where, "even if each Class member were to bring an individual action, each would be required to prove the existence of the alleged activities of the defendants in order to prove liability." <u>Id.</u>

Here, only the issue of damages will be different for each class member, depending upon the number of shares owned by a each class member and the dates on which those shares were purchased and sold. Further, as discussed above, the class members' claims involve the same questions of fact and law. Thus, if each class member were to bring suit individually, each would have to allege and prove virtually identical facts. Therefore, common questions predominate.

Rule 23(b)(3) sets forth the following factors to be considered in making a determination of superiority: "(A) The interest of members of the class in individually controlling the prosecution . . . of separate actions; (B)

The extent and nature of any litigation concerning the
controversy already commenced by . . . members of the class;
(C) The desirability . . . of concentrating the litigation
of the claims in the particular forum; and (D) The
difficulties likely to be encountered in the management of a
class action." Fed. R. Civ. P. 23(b)(3).  As the court
observed in In re Blech Sec. Litig.,

> In general, securities suits . . . easily satisfy the
> superiority requirement of Rule 23.  Most violations of
> the federal securities laws . . . inflict economic injury
> on large numbers of geographically dispersed persons such
> that the cost of pursuing individual litigation to seek
> recovery is often not feasible.  Multiple lawsuits would
> be costly and inefficient, and the exclusion of class
> members who cannot afford separate representation would
> neither be 'fair' nor an adjudication of their claims.
> Moreover, although a large number of individuals may have
> been injured, no one person may have been damaged to a
> degree which would induce him to institute litigation
> solely on his own behalf.

187 F.R.D. at 107.

The reasoning of the court in Blech applies in the
present action, where there are potentially several hundred
thousand class members, and the expected recovery per share
is low.  Because of the large number of potential claimants
and the relatively small damage suffered by each claimant,
it is unlikely that individual plaintiffs would endure the
expense of litigation in order to bring their claims.
Moreover, there is no indication that counsel are likely to
encounter any difficulties in administering the settlement

of the actions.  Therefore, because class action treatment is superior to any other method for the fair and efficient adjudication of this action, the requirements of Rule 23(b)(3) are satisfied.

Because the factors for class certification set forth in Rule 23(a) and Rule 23(b)(3) have been met, the application to certify the classes for settlement is granted.

### (ii) Approval of Final Settlement

Federal Rule 23(e) governs the settlement of class actions and requires court approval before a settlement is executed.  Adequate notice of the proposed settlement must be provided and the proposed settlement must be the subject of a fairness hearing. Fed. R. Civ. P. 23(e)(1).  In addition, a court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable" and not a "product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000).  This evaluation requires the court to consider both "the settlement's terms and the negotiating process leading to settlement." Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005).  The determination of the fairness of a settlement is a matter addressed to the

district court's sound discretion.  Joel A., 218 F.3d at 139.

*Adequacy of Notice*

While there are no rigid rules to determine the adequacy of notice in a class action, the standard is generally that of reasonableness.  Wal-Mart, 396 F.3d at 113-14.  Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members. Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir. 1988).  Notice is generally deemed reasonable if the average person understands the terms of the proposed settlement and the options provided to class members thereunder. Wal-Mart, 396 F.3d at 114.

Counsel provided potential class members with adequate notice of the Settlement.  Counsel, through a Court-approved claims administrator, disseminated the Notice to more than 604,000 potential claimants.  In plain language that is easily understood by the average person, the notice set forth essential information, including the background of the Action, the terms of the Settlement, the Plan of Allocation, and the various rights of class members under the Settlement (including the right to opt out, file

19

objections, and attend the Fairness Hearing). Appended to each Notice was a form for proof of claim, which contained detailed instructions for filing claims under the Settlement. Counsel also complied with the publication requirement, causing summary notice to be published in the USA Today and electronically on the PR Newswire. The summary notice contained the required information regarding the Settlement terms and process and provided clear instructions on how potential claimants could obtain a copy of the notice and proof of claim. Accordingly, the Court finds that notice of the proposed settlement of this case was reasonable.

*Procedural Fairness*

"A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" Wal-Mart, 396 F.3d at 116 (quoting Manual for Complex Litigation, Third, § 30.42 (1995)). "'The experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves' shed light on the fairness of the negotiating process." Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071, 2005 U.S. Dist. LEXIS

24890, at *13 (S.D.N.Y. Oct. 24, 2005) (quoting <u>Malchman v.</u> <u>Davis</u>, 706 F.2d 426, 433 (2d Cir. 1983)).

From the record of this case, there is every indication that the negotiations leading to the Settlement were procedurally fair. As counsel state, the settlement "was the result of lengthy negotiations between Plaintiffs' Lead counsel and Defendants' counsel over several months." (Lead Plaintiffs' Motion for Final Approval of Class Action Settlement ("Pl. Mem. Settle.") at 25.) The parties first discussed the potential for settlement in the summer of 2006 afgter the Second Circuit decided <u>Lentell</u>, and continued negotiations until the execution of the Stipulation in August 2007. As noted, class counsel and defendants' counsel are experienced in complex securities class litigation. Further, as discussed below, given class counsels' access to discovery from the NYAG's investigation and given their research and analysis of the applicable law in light of the Second Circuit's developing jurisprudence as the litigation progressed, counsel were in an excellent position to evaluate the strength of the class claims and arrive at a reasonable settlement sooner rather than later.

In sum, counsel with wide experience and demonstrated skill in the field of class action securities litigation represented both sides in reaching the

Stipulation after protracted negotiations. There is nothing in the record of this litigation to rebut the presumption of procedural fairness in the negotiation process. The Court thus finds that the process by which the parties negotiated the proposed settlement was fair and reasonable.

*Substantive Fairness*

Courts of the Second Circuit examine the well-established "Grinnell factors" to determine whether a settlement is substantively fair and reasonable as required by Rule 23(e). The factors that a district court considers are:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

D'Amato v. Deutsche Bank, 236 F.3d 78, 86 (2d Cir. 2001) (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 463, abrogated on other grounds by Goldberger v. Integrated Reserves, Inc., 209 F.3d 43 (2d Cir. 2000)). A court need not find that every factor militates in favor of a finding of fairness; rather, a court "consider[s] the totality of

these factors in light of the particular circumstances." In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

In the Tyco Action, as in the three global settlements of the MDL Cases over which this Court has presided, the factors that weigh most heavily in favor of approval of the settlement are:  the positive reaction of prospective class members to the proposed settlement; the great difficulty that the plaintiffs would confront in attempting to establish liability and damages; and the range of reasonableness of the litigation, in light of the attendant risks of pressing forward with this case.

As noted, the reaction of the class has been overwhelmingly positive.  Counsel received only twelve requests for exclusion and two objections, neither of them substantive, as discussed below, after more than 604,000 notices were sent to potential class members.  "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart, 396 F.3d at 118.  Here, the relatively small number of objections and requests for exclusion militate in favor of approving the settlement as fair, adequate, and reasonable. See, e.g., D'Amato, 236 F.3d at 86 (approving settlement where eighteen objections were filed after notice

was sent to 27,883 class members); <u>McBean v. City of New York</u>, 233 F.R.D. 377, 386 (S.D.N.Y. 2006) (approving settlement where, after notice was sent to 40,352 class members, only four objected and 36 opted out of settlement); <u>Hicks</u>, 2005 U.S. Dist. LEXIS 24890, at *16 (finding that reaction of class supported approval, where 123 class members out of approximately 100,000 requested exclusion and only three filed objections).

The high risk of proceeding with this case and attempting to prove the defendants' liability and establish damages weighs most heavily in favor of finding the settlement fair, adequate, and reasonable. Here, as in the MDL Cases, plaintiffs suffered in the district court dismissal with prejudice on loss causation grounds. While the parties awaited the scheduling of oral argument on plaintiffs' pending appeal, the Second Circuit decided <u>Lentell</u>, 396 F.3d at 161, in which the Court of Appeals affirmed on loss-causation grounds Judge Pollack's with-prejudice dismissal of the "test cases," which like this case involved plaintiffs' claims that they had incurred losses as a result of allegedly fraudulent research reports issued by Merrill Lynch. <u>See</u> <u>also</u> <u>Joffee v. Lehman Bros.</u>, 209 Fed. Appx. 80 (2d Cir. 2006)(unpublished opinion)(affirming dismissal of complaint in putative

24

securities class action, relating to allegedly fraudulent research reports, on loss causation grounds). Given the grim prospects faced by the class in light of the Second Circuit's rulings, "[t]here is little question that the settlement agreements . . . are fair and adequate to the class because they would provide what further litigation could not—any recovery for class members." In re Stock Exchs. Options Trading Antitrust Litig., No. 99 Civ. 0962, 2006 U.S. Dist. LEXIS 87825, at *26 (S.D.N.Y. Dec. 4, 2006) (internal quotations and citation omitted)). Here, as in the MDL Cases, the alternative to settlement was likely the affirmance by the Second Circuit of Judge Pollack's dismissal of the plaintiffs' Complaint.

Similarly, the reasonableness of the settlement, in light of the risk faced by the plaintiffs in going forward, militates in favor of approval. Here, the Settlement Fund will amount to a certain cash recovery for the class of $4.9 million, plus interest. When balanced against the very high risk of complete non-recovery, the settlement is reasonable. Moreover, the estimated recovery of three percent of the total damages estimated by the plaintiffs, does not meaningfully diverge from the range of reasonableness for settlements of similarly-sized securities class actions. See, e.g., Hicks, 2005 U.S. Dist. LEXIS

24890, at *19 (finding a settlement representing 3.8% of plaintiffs' estimated damages to be within range of reasonableness); see also Ellen M. Ryan & Laura E. Simmons, Cornerstone Research, Securities Class Action Settlements: 2007 Review and Analysis, at 6, available at http://securities.cornerstone.com/pdfs/settlements_2007.pdf (reporting that, in 2007, the median settlement as a percentage of estimated damages was 3.5% in securities class actions where estimated damages ranged between $126 and $500 million).

In sum, after considering the relevant <u>Grinnell</u> factors, the Court finds that the Settlement is substantively fair and reasonable.

## *Objections to Settlement*

Only two objections to the settlement have been received. The objections, which are both addressed, have no merit.

*Hugh Lowe*: Mr. Lowe, an attorney, complains that he did not receive his notice of the pending settlement until December 18, 2007, which was after the December 3, 2007 deadline that was set for the filing of objections or requests for exclusion. Mr. Lowe also protests "Inadequate Procedural Safeguards and Inadequate Representation." In particular, he objects to the fact that, in order to submit

a valid proof of claim form, he is required to find certain financial records he claims that he does not possess and does not know how to find.  Mr. Lowe suggests that class counsel re-send notice to all potential class members and include with each notice the records of each individual recipient's ownership of Tyco shares.  Following Mr. Lowe's suggestion would increase the costs incurred by counsel and therefore significantly reduce the amount of recovery.  This is a bad idea.

*William Wright*:  Mr. Wright, a retired attorney, protests that the proposed settlement will provide only a nominal recovery to individual class members and that filing proof of claim forms will simply not be worth the effort.  Mr. Wright also objects to class counsels' requested fee of $1.25 million, in light of each class member's nominal recovery.

Neither objection addresses the <u>Grinnell</u> factors or otherwise weighs against a finding that the settlement is fair, reasonable and adequate.  The objections are overruled.

*Adequacy of Plan of Allocation*

"In approving an allocation plan, the Court must ensure that the distribution of funds is fair and reasonable." <u>Hicks</u>, 2005 U.S. Dist. LEXIS 24890, at *19-20

(citations omitted).  A plan of allocation that is devised by competent and experienced class counsel "need have only a reasonable, rational basis." Id. (internal quotations and citation omitted).

The Plan of Allocation calls for the Net Settlement Fund to be distributed on a pro rata basis to valid class members based on their proof of recognized loss, which is a function of the amount of Tyco shares owned by each claimant during the class period and the dates on which the shares were purchased, then sold.  A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is presumptively reasonable. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *39-40; Hicks, 2005 U.S. Dist. LEXIS 24890, at *21 (citing In re Global Crossing, 225 F.R.D. at 462).  Further, the Plan of Allocation in this case was described in detail in the notice that was sent to each potential class member, and no class member has objected to the plan.  Accordingly, the Court finds that the Plan of Allocation is fair and reasonable.

In sum, the Court approves the Settlement and Plan of Allocation as fair, reasonable, and adequate.

### (iii) Attorneys' Fees

Lead Counsel request an award of attorneys' fees in the amount of 25% of the Settlement Fund. As of January 9, 2008, the Settlement Fund amounted to approximately $5 million. Thus, the percentage requested by counsel translates to a fee award of approximately $1.25 million. The requested award translates, in turn, to a multiple of approximately 2.33 of counsels' aggregate lodestar of $537,309. If granted, the requested percentage would award counsel an hourly rate of approximately $1,009 for the legal and paraprofessional work expended in this litigation. The requested percentage comports with the terms of the notice that was sent to potential class members, which stated that counsel would not request fees in excess of 25% of the Settlement Fund.

"[W]here an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class . . . the attorneys whose efforts created the fund are entitled to a reasonable fee-set by the court-to be taken from the fund." Goldberger, 209 F.3d at 47. A district court has broad discretion to award attorneys' fees, and an award of fees will be overturned only for abuse of that discretion. Id. In the Second Circuit, a district court may calculate attorneys'

fees in one of two ways.  Under the "lodestar" method, "an
attorney fee award is derived by multiplying the number of
hours reasonably expended on the litigation by a reasonable
hourly rate." A.R. v. N.Y. City Dep't of Educ., 407 F.3d 65,
79 (2d Cir. 2005)(internal quotations and citations
omitted).  The court then may apply a multiplier to the
lodestar figure to account for other factors, such as the
risk of the litigation, the performance of counsel, or the
success achieved. See In re Twinlab corp. Sec. Litig., 187
F. Supp. 2d 80, 84-85 (E.D.N.Y. 2003).  The percentage of
the fund method is a simpler calculation where the award is
based on "some percentage of the fund created for the
benefit of the class." Savoie v. Merchants Bank, 166 F.3d
456, 460 (2d Cir. 1999) (citing Blum v. Stenson, 465 U.S.
886, 900 n.16 (1984)).

     Both the lodestar and percentage methods are
permissible methods of calculating reasonable attorneys'
fees. Goldberger, 209 F.3d at 50.  The trend in the Second
Circuit, however, has been to express attorneys' fees as a
percentage of the total settlement, rather than to use the
lodestar method to arrive at a reasonable fee. Wal-Mart, 396
at 121; In re Elan Sec. Litig., 385 F. Supp. 2d 363, 373
(S.D.N.Y. 2005).  The Second Circuit disfavors application
of the lodestar method because the "lodestar create[s] an

unanticipated disincentive to early settlements, tempt[s]
lawyers to run up their hours, and compel[s] district courts
to engage in a gimlet-eyed review of line-item fee audits."
Wal-Mart, 396 F.3d at 122 (internal quotations and citation
omitted); see also In re AOL Time Warner, Inc. Sec. &
"ERISA" Litig., No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS
78101, at *24 (S.D.N.Y. Sept. 28, 2006), report and
recommendation adopted by 2006 U.S. Dist. LEXIS 77926
(S.D.N.Y. Oct. 25, 2006) (noting that "every significant
Southern District opinion facing the issue since Goldberger
has embraced the percentage approach").  The percentage
method usually is deemed to be preferable "because it
reduces the incentive for counsel to drag the case out to
increase the number of hours billed; also, fewer judicial
resources will be spent in evaluating the fairness of the
fee petition." Hicks, 2005 U.S. Dist. LEXIS 24890, at *23
(citation omitted).  Use of the percentage method also
comports with the statutory language of the Private
Securities Litigation Reform Act of 1995 ("PSLRA") which
specifies that "total attorneys' fees and expenses awarded
by the court to counsel for the plaintiff class shall not
exceed a reasonable percentage of the amount of any damages
and prejudgment interest actually paid to the class . . . ."
15 U.S.C. § 78u-4(a)(6) (emphasis added); Maley v. Del

Global Tech., 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002)
(noting that in amending the PSLRA, Congress "indicated a
preference for the use of the percentage method").

Whether the fee is calculated using the lodestar
or percentage method, courts consider the following
Goldberger factors in determining a reasonable award of
fees:  "(1) the time and labor expended by counsel; (2) the
magnitude and complexities of the litigation; (3) the risk
of litigation . . .; (4) the quality of representation; (5)
the requested fee in relation to the settlement; and (6)
public policy." Goldberger, 209 F.3d at 50.  "Even when the
percentage method is used, however, the Second Circuit
'encourages the practice of requiring documentation of hours
as a 'cross-check' on the reasonableness of the requested
percentage.'" In re Visa Check/Mastermoney Antitrust Litig.,
297 F. Supp. 2d 503, 520-21 (E.D.N.Y. 2003), aff'd Wal-Mart,
396 F.3d at 96 (2d Cir. 2005) (quoting Goldberger, 209 F.3d
at 50).  In evaluating the lodestar value for "cross-check"
purposes, the hours submitted by the attorneys are reviewed
but not exhaustively scrutinized. Goldberger, 209 F.3d at
50.  In determining a reasonable award of attorneys' fees,
the Court seeks to balance the "overarching concern for
moderation with the concern for avoiding disincentives to
early settlements." In re Elan Sec. Litig., 385 F. Supp. 2d

at 376 (citations and internal quotations omitted).  A fee
award "should be assessed based on scrutiny of the unique
circumstances of each case, and 'a jealous regard to the
rights of those who are interested in the fund.'"
<u>Goldberger</u>, 209 F.3d at 53 (quoting <u>Grinnell</u>, 495 F.2d at
469).

        Although reference to fee awards in other cases
may not always be particularly helpful in fashioning a
reasonable and fair award in a case that is currently before
the court, the Tyco Action, as noted, is highly similar to
the MDL Cases.  Therefore, the awards of attorneys' fees in
the three previous global settlements of the MDL Cases
provide useful benchmarks in determining a fair and
reasonable award of fees in the present action.
Accordingly, where appropriate, I contrast the application
of the <u>Goldberger</u> factors in this case with their
application in the previous global settlements of the MDL
Cases.

*(1) Time and Labor Expended*

        Plaintiffs' counsel expended a total of 1238.75
hours of legal and paraprofessional work over the course of
more than four years of litigation.[4]  By contrast, counsel

_____

        [4]The hours worked by each law firm are as follows: Law
Offices of Bernard M. Gross (Lead Counsel) expended 878.9 hours;

33

in the Mutual Fund Cases expended a total of 9462 hours,
over four years of litigation.  Lead Counsel state that the
work included: the preparing and filing of the initial
complaints and the consolidated amended class complaint;
filing a motion to consolidate the member cases and to
appoint Lead Plaintiffs and Lead Counsel; review of
publically available documents, including Tyco's and Merrill
Lynch's public filings, research reports issued by the
defendants, complaints relating to Tyco and its officers
filed by the Securities and Exchange Commission (the "SEC"),
documents from the NYAG's investigation, and transcripts
from the trial of Dennis Kozlowski and his co-defendants;
preparing and filing the opposition to the defendants'
motion to dismiss; preparing and filing an appellate brief
in the Second Circuit; conducting settlement negotiations;
and negotiating and drafting various documents relating to
settlement, including the Stipulation, the proposed
Preliminary Order, and the notice to potential class
members.

Counsels' work in this case resembles the efforts
of counsel in the Mutual Fund Cases where, in addition to
reviewing publically available documents and conducting

---

Vianale & Vianale expended 50.5 hours; Berger & Montague expended
139.9 hours; and Pomerantz, Block, Grossman, and Gross (Liaison
Counsel) expended 170.45 hours.

settlement negotiations, the work included the vigorous
litigation of motions to dismiss and appeal of the
dismissals.  Here, however, as in the Mutual Fund Cases,
where I granted an award of 22.5% of attorneys' fees,
informal discovery was limited to the review of public
documents and therefore "did not involve intricate disputes
over privilege or other difficult legal issues nor did
plaintiffs have to undertake special means to procure
evidence that was hard to obtain." In re Keyspan Corp. Sec.
Litig., No. 2001-5852, 2005 U.S. Dist. LEXIS 29068, at *30
(E.D.N.Y. Aug. 25, 2005).  By contrast, the relative ease of
discovery in this case distinguishes it from the more
difficult work that was performed in the Internet Cases, in
which I awarded attorneys' fees in the amount of 24%, where
counsel were forced to fight for access to documents from
the NYAG's investigation of Merrill Lynch and attempt to
overcome the NYAG's claim of privilege.  In addition, there
is no indication that settlement negotiations in this case
were particularly hard-fought, or that formulating the Plan
of Allocation or any other provisions of the Settlement was
especially complex or arduous.

        In sum, the time and labor expended by counsel in
this case do not weigh in favor of an especially generous
award of attorneys' fees.  By the same token, the labor

expended in this matter was substantial, and this factor does not call for an award far below counsels' requested 25%.

*(2) Magnitude and Complexity*

Securities class litigation "'is notably difficult and notoriously uncertain.'" In re Sumitomo Copper Litig., 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (quoting In re Michael Milken and Assoc. Sec. Litig., 150 F.R.D. 46, 53 (S.D.N.Y. 1993)). The magnitude and complexity of a case, however, also should be evaluated in comparison with other securities class litigations. See In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005) (evaluating the complexity of the class action relative to other securities actions); accord FTR Consulting Group, Inc v. Advantage Fund II Ltd., No. 02 Civ. 8608, 2005 U.S. Dist. LEXIS 20013, at *15 (S.D.N.Y. Sept. 14, 2005).

Counsel assert that the "magnitude and complexity of this Action, particularly with respect to loss causation and damages, is just as great as in the mutual fund and internet stock research report cases against Merrill Lynch." (Motion on Class Counsels' Joint Application for an Award of Counsel Fees and Reimbursement of Expenses "("Pl. Mem. Attny. Fees") at 13.) Counsel point to the Second Circuit's decisions, first in Lentell, and then, approximately one

year later, in <u>Joffee</u>, 209 Fed. Appx. at 80, in which the
Court of Appeals affirmed with-prejudice dismissals of cases
in which the defendants were alleged to have issued
fraudulently optimistic research reports, on the ground that
the plaintiffs had failed adequately to plead loss
causation.

Counsel are correct that the plaintiffs in this
case faced very high, if not insurmountable, hurdles in
pleading and proving their claims.  However, the analysis of
the "magnitude and complexity" of this case is similar to
that undertaken in the Mutual Fund Decision, in which the
Court found that "[a]lthough the plaintiffs faced a steep
uphill, and ultimately losing, battle in prosecuting their
claims, the magnitude of these Actions and the complexity of
the factual issues involved . . . were not so enormous as to
warrant a determination that this factor weighs
significantly in favor of the award of generous attorneys'
fees." Mutual Fund Decision, 2007 U.S. Dist. LEXIS 9450, at
*51.  Here, as in the Mutual Fund Cases, the magnitude and
complexity of the litigation are not remarkable when
compared with those aspects in other complex securities
class actions. <u>Compare</u> <u>In re Visa Check/Mastermoney Litig.</u>,
297 F. Supp. 2d at 523 (finding magnitude and complexities
of case "enormous" where the "case involved almost every

U.S. bank and more than five million U.S. merchants"); <u>In re</u>
<u>Sumitomo Copper Litigation</u>, 74 F. Supp. 2d 393, 395
(S.D.N.Y. 1999) (case involved "almost overwhelming
magnitude and complexity"); <u>In re NASDAQ Market-Makers</u>
<u>Antitrust Litig.</u>, 187 F.R.D. 465, 474, 488 (S.D.N.Y. 1998)
(finding that "liability in this case requires proof of an
unusually complex conspiracy involving 37 Defendants and a
'checkerboard' of fact situations and disparate periods for
each of 1,659 different securities" and that "the issues
were novel and difficult requiring a challenge to a long-
standing industry practice and the exercise of skill and
imagination").  Plaintiffs certainly encountered difficulty
in pressing forward with their legal theories, but the
issues confronted by the plaintiffs, consisting among other
things of pleading and proving loss causation, were not
substantially more complicated than the issues most
plaintiffs typically encounter in prosecuting securities
class action claims.

    As in the Mutual Fund Cases, factors that
typically denote complexity were absent from this
litigation.  For example, although counsel were required to
familiarize themselves with developments in securities law,
they were not required to master a new or novel area of law.
<u>See, e.g.</u>, <u>Denney v. Jenkens & Gilchrist</u>, 230 F.R.D. 317,

352 (S.D.N.Y. 2005), aff'd in part, vacat'd in part on other grounds by <u>Denney v. Deutsche Bank, A.G.</u>, 443 F.3d 253 (2d Cir. 2006) (finding complexity to be a significant factor where "Class Counsel had to expend significant time learning the complicated tax shelter business in order to prosecute plaintiffs' claims"); <u>Ling v. Cantley & Sedacca, L.L.P.</u>, No. 04 Civ. 4566, 2006 U.S. Dist. LEXIS 4711, at *4-5 (S.D.N.Y. Feb. 8, 2006) (finding that work performed by class counsel, though extensive, did not include "the use of any particularly novel or complex skill").  In addition, as noted, fact investigation and informal discovery in this case largely involved the review of public documents and was not especially difficult.  By the time the parties reached settlement, no formal document discovery had taken place, and no witnesses had been deposed.

In this case, therefore, as in the Mutual Fund Cases, where I awarded a fee of 22.5% and which counsel expressly invoke in support of their application for an award of 25%, the "magnitude and complexity" factor does not call for a particularly generous fee.

*(3) Risk of Litigation*

Courts of the Second Circuit have recognized the risk of litigation to be "perhaps the foremost factor to be considered in determining" the award of appropriate

attorneys' fees.  In re Elan Sec. Litig., 385 F. Supp. 2d at
374 (internal quotations and citation omitted).  There is
generally only a very small risk of non-recovery in a
securities class action. See Dreyfus Aggressive Growth
Mutual Fund Litigation, No. 98 CV4318, 2001 U.S. Dist. LEXIS
8418, 2001 WL 709262, at *4 (S.D.N.Y. June 22, 2001) ("What
empirical data does exist indicates that all but a small
percentage of class actions settle, thereby guaranteeing
counsel payment of fees and minimizing the risks associated
with contingency fee litigation.") (citing S. Rep. No. 104-
98, at 9 (1995) (estimating that about 300 securities
lawsuits are filed each year and that 93% of these cases
reach settlements).  In the Mutual Fund Decision, I  noted
that "'where claims were precipitated by public events,' the
risk undertaken by class counsel is especially slight."
Mutual Fund Decision, 2007 U.S. Dist. LEXIS 9450, at *54
(quoting In re Bristol-Myers Squibb Sec. Litig., 361 F.
Supp. 2d at 234); see also Goldberger, 209 F.3d at 54 (2d
Cir. 2000) (finding contingency risk to be low where case
arose from notorious fraud prosecution); Karpus v. Borelli
(In re Interpublic Secs. Litig.), No. 03 Civ 1194, 2004
U.S. Dist. LEXIS 21429, at *35 (S.D.N.Y. Oct. 26, 2004)
("This was not a case in which there was a government
investigation that had resulted in disclosure of misconduct

40

and was also driving a settlement."); In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d at 523 (determining litigation to be risky where "Lead Counsel did not benefit from any previous or simultaneous government litigation"); Rogers v. Sterling Foster & Co. (in Re Sterling Foster & Co.), 238 F. Supp. 2d 480, 488 (S.D.N.Y. 2002) (finding contingency risk to be low in light of previous government investigations of defendants); In re Dreyfus Aggressive Growth Mut. Fund Litig., 2001 U.S. Dist. LEXIS 8418, at *20-21 (finding risk to be low "where there was substantial overlap between the government's investigations and the plaintiffs' claims"); In re Bausch & Lomb, Inc. Sec. Litig., 183 F.R.D. 78, 87 (W.D.N.Y. 1998) (SEC investigation begun after commencement of securities action "clearly overlapped" and "put additional pressure on [defendant] to settle the case, and would also have given plaintiffs' counsel greater reason to believe that they could prevail").

Here, counsel compare their risk with that faced by counsel in the Internet Cases, rather than the risk faced by counsel in the Mutual Fund Cases. In the Mutual Fund Cases, I found that the risk of non-recovery faced by the plaintiffs was minimal, given the NYAG's highly publicized investigation into Merrill Lynch's misconduct and the

resulting settlement between Merrill Lynch and the NYAG,
even though plaintiffs in the Mutual Fund Cases were faced
with the daunting prospect of proving loss causation.  In
the Internet Cases Decision, I found that the risk was
comparatively greater, because the first of the twenty
consolidated Internet Cases was filed months before the
NYAG's investigation of and settlement with Merrill Lynch
became public.  Counsel in the present action claim that
"[t]he risk of non-recovery for Plaintiffs' Counsel in this
litigation in June 2003 [when this action commenced] was
comparable if not greater than, the risk that existed for
counsel in the [Internet Cases].  Plaintiffs' Counsel had to
prove their case against Merrill and Young without relying
on regulatory or governmental investigations and
settlements, as well as prove that Merrill and Young were
not defrauded by the corruption that existed at Tyco." (Pl.
Mem. Attny. Fees at 16.)  Counsel contend that, at the time
this action commenced, they "embarked on investigating and
filing this case with the understanding that no governmental
or regulatory investigation existed at the time involving
Merrill Lynch related to the Company's coverage of and
relationship with Tyco." (Id. at 17.)

　　　　Counsel fail to show how the risk in this action
is substantively different from that faced by counsel in the

Mutual Fund Cases.  First, it is simply not true that counsel in this case did not rely on "regulatory or governmental investigations or settlements" in prosecuting this case.  As counsel themselves acknowledge in their memorandum, document review in this case consisted of review of the NYAG's voluminous documentation relating to Merrill Lynch's allegedly fraudulent practices as well as a review of the transcripts of the criminal trials of Dennis Kozlowski and other Tyco executives.  Second, the fact that the government had not initiated an investigation that specifically related to Merrill Lynch's relationship with Tyco is of no moment.  As in the present action, at the time the initial complaints were filed in the Mutual Fund and Internet Cases (excluding the first of the twenty consolidated actions), there was no governmental investigation pending against Merrill Lynch.  In other words, neither the Tyco Action nor any of the MDL Cases that have been settled (apart from the first of the twenty consolidated Internet Cases) were litigated concurrently with governmental or regulatory proceedings.

For the purpose of evaluating the risk of non-recovery faced by counsel at the litigation's outset, the key fact is that the present case, like all but one of the MDL Cases, were commenced against Merrill Lynch <u>after</u> the

NYAG announced the results of its long-term investigation into alleged conflicts of interest between Merrill Lynch's brokerage and investment banking divisions.  The fact that Merrill Lynch settled with the NYAG did not remove the pressure brought to bear on the company by the highly publicized announcement of the governmental proceeding. See Mutual Fund Decision, 2007 U.S. Dist. LEXIS 9450, at *57 (describing the "publicity generated by the NYAG's investigation and settlement, and the pressure brought to bear upon the defendants as a result of those events".) Here, too, the misconduct that Merrill Lynch and Phua Young are accused of is precisely the activity that was the subject of the NYAG's proceeding:  namely, the issuance of fraudulent research reports to unsuspecting investors, in which Merrill Lynch's analysts provided falsely optimistic opinions about certain companies' stock so that Merrill Lynch could generate investment banking revenue from those companies.  As the NYAG stated in a May 2002 press release, "A core issue [in the NYAG's investigation] was whether or not analysts were being truthful and fair in their public pronouncements on stocks of companies for which Merrill Lynch did investment banking business." NYAG Press Release, Spitzer, Merrill Lynch Reach Unprecedented Agreement to

<u>Reform Investment Practices</u>, May 21, 2002, available at
<u>http://www.oag.state.ny.us/press/2002/may/may21a_02.html.</u>

In sum, the relevant proceedings here, as in the
MDL Cases, were the NYAG's prior proceedings against Merrill
Lynch, not the proceedings launched by other governmental
actors against Tyco and its officers.  Given the pressure
brought to bear upon Merrill Lynch in the aftermath of the
NYAG's investigation and settlement, counsel commenced this
Action with the justified expectation of a favorable
disposition, despite the development of unfavorable legal
precedent.  Accordingly, the slight risk of non-recovery in
this action weighs against the award of a particularly high
percentage of the Settlement Fund.

*(4) Quality of Representation*

To evaluate the "quality of the representation,"
courts review the recovery obtained and the backgrounds of
the lawyers involved in the lawsuit. <u>See</u> <u>In re Global
Crossing Sec. & ERISA Litig.</u>, 225 F.R.D. at 467.  "The
quality of opposing counsel is also important in evaluating
the quality of Class Counsels' work." <u>In re KeySpan Corp.
Sec. Litig.</u>, 2005 U.S. Dist. LEXIS 29068, at *35 (citing
<u>Warner Communications Sec. Litig.</u>, 618 F. Supp. 735, 749
(S.D.N.Y. 1985)).

Here, as noted above, counsel obtained a reasonable recovery for the Class Members of approximately 3% of total claimed damages. Given the grim procedural posture of this action and the likelihood of complete non-recovery in the event that the litigation continued, the settlement obtained constitutes a favorable result for the class.

Counsel assert that "[e]ach of the plaintiff firms practice extensively in the highly complex field of shareholder securities litigation." (Pl. Mem. Attny. Fees at 17.) Counsel also point to the defense mounted by defendants' counsel, "with vast resources at their disposal who vigorously defended their clients and challenged Lead Plaintiff's claims on substantive grounds." (Id. at 18.) I further note that defense counsel in this case also acted as counsel for the defendants in the MDL Cases and the global settlements, where I acknowledged the high quality of representation provided by both plaintiffs' and defendants' counsel.

Accordingly, I find that the quality of representation in this case does not militate against the award of a generous fee.

*(5) Requested Fee in Relation to Settlement*

Counsel observe that "awards in the range of 25 percent have often been approved in this Circuit." (Pl. Mem. Attny. Fees at 19) (citing cases). Counsel also cite to this Court's award of a 22.5% fee in the Mutual Fund Cases and a 24% fee in the Internet Cases, and state that the "25 percent fee requested is reasonable and certainly in line with the fee percentages awarded in other research report cases." (Id.)

Although counsel are correct that a number of cases could be cited to support or oppose the argument that a 25% fee in a securities class action of this size is reasonable, "reference to awards in other cases is of limited usefulness." In re KeySpan Corp. Sec. Litig., 2005 U.S. Dist. LEXIS 29068, at *40 (citing Goldberger, 209 F.3d at 53). This is because "fee awards should be assessed based on the unique circumstances of each case." In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d at 236 (citing Goldberger, 209 F.3d at 52). Nevertheless, in light of the many similarities between this case and the Mutual Fund Cases, the 22.5% fee that I granted in the Mutual Fund Cases provides a highly useful benchmark from which to assess the reasonableness of counsel's present request for a 25% fee.

The awards of 22.5% in the Mutual Fund Cases and that of 24% in the Internet Cases were based on a painstaking application of the Goldberger factors to the facts of those cases.  Here, the time and labor expended by counsel and the risk of litigation counsel confronted at the outset of the case share more in common with those factors as they applied in the Mutual Fund Cases than in the Internet Cases.  As discussed, the Internet Cases involved more arduous discovery and more extensive, varied, and complicated labor than was involved in either the Mutual Fund Cases or this action.  In addition, the risk of non-recovery was somewhat greater for counsel in the Internet Cases than it was for counsel in either the Mutual Fund Cases or this action.  Thus, the reasonableness of the requested fee in relation to the settlement is better evaluated with reference to the Mutual Fund Cases, where I awarded a 22.5% fee.

*(6) Public Policy*

Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation. See In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and

willing to do so, it is necessary to provide appropriate
financial incentives."). As Judge Holwell explained in
<u>Hicks</u>, 2005 U.S. Dist. LEXIS 24890,

> Private actions to redress real injuries further the
> objectives of the federal securities laws by protecting
> investors and consumers against fraud and other
> deceptive practices. Such actions could not be
> sustained if plaintiffs' counsel were not to receive
> remuneration from the settlement fund for their efforts
> on behalf of the class. Due to the dispersed, and
> relatively small, losses among a large pool of
> investors, the class action mechanism and its
> associated percentage-of-recovery fee award solve the
> collective action problem otherwise encountered by
> which it would not be worthwhile for individual
> investors to take the time and effort to initiate the
> action. To make certain that the public is represented
> by talented and experienced trial counsel, the
> remuneration should be both fair and rewarding. The
> concept of a private attorney acting as a private
> attorney general is vital to the continued enforcement
> and effectiveness of the Securities Acts.

<u>Id.</u> at *26-27 (citation and internal quotations omitted).

Here, where many if not most class members are
individual investors, public policy supports an award
sufficient to encourage  counsel to act on behalf of such
investors. <u>See</u> <u>In re Bristol-Myers Squib</u>, 361 F. Supp. 2d at
236; <u>In re VisaCheck/Mastermoney</u>, 297 F. Supp. 2d at 524
("The fees awarded must be reasonable, but they must also
serve as an inducement for lawyers to make similar efforts
in the future."). An award of fees in excess of that
required to encourage class litigation, however, does not
necessarily serve public policy.

49

Here, as discussed at greater length below, the requested fee of 25% translates to an aggregate rate of $1,009 for every hour of legal and paraprofessional work expended during this litigation.  This rate is in excess of what is required to induce qualified counsel to bring securities class litigation that would otherwise not be prosecuted.  Accordingly, public policy concerns do not weigh in favor of granting the requested fee of 25%.

*Lodestar Cross-Check*

Even in cases where the court applies the percentage method of fee calculation, documentation of hours remains a useful "cross-check" on the reasonableness of the requested percentage. Goldberger, 209 F.3d at 50. Nevertheless, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case . . . ." Id.  Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar. In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. at 467-68.  The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.  Id.

Counsel have expended 1238.75 hours during the litigation, for total billed charges, or a "lodestar", of $537,308.50, and these figures are supported by detailed time records submitted by counsel. The lodestar represents an aggregate hourly rate of approximately $434. The rates charged at counsels' firms fall well within the range of reasonableness. For example, the hourly rates charged by Lead Counsel range from $615 (for the named partner) to $350, for associates. See In re Gilat Satellite Networks, No. 02 Civ. 1510, 2007 U.S. Dist. LEXIS 68964, at *54 (S.D.N.Y. Sept. 18, 2007) (finding that hourly rates ranging from $325 for associates to $725 for senior partners were reasonable); Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth., No. 76 Civ. 2125, 2005 U.S. Dist. LEXIS 5200, at *35 (S.D.N.Y. Mar. 31, 2005) (observing that "a recent billing survey made by the National Law Journal shows that senior partners in New York City charge as much as $ 750 per hour and junior partners charge as much as $ 490 per hour") (citing In Focus:  Billing;  A Firm-by-Firm Sampling of Billing Rates Nationwide, Nat'l Law Journal, December 6, 2004, at 22)). According to counsels' time records, the majority of the work in this Action (approximately 68%) was performed by personnel charging rates below $500 per hour, which distinguishes this case from both the Mutual Fund

Cases and the Internet Cases, where the majority of the work was performed by lawyers who billed their time at more than $500 per hour.  Thus, the hourly rates charged by the lawyers who worked on this case are reasonable.

Counsel's requested fee of 25% of the Settlement Fund represents a multiple of approximately 2.33 of the aggregate loadstar.  Counsel cite the multipl;iers that resulted from the awards granted in the Mutual Fund Cases (a multiplier of 1.95), and the Internet Cases (a multiplier of 1.985), in support of their application.

Although the multiplier of 2.33 is not <u>per se</u> exorbitant, neither is it particularly modest.  As I noted in the Mutual Fund Cases, where I refused to grant counsels' request for a fee of 28% and instead awarded 22.5%, "as a rule, 'post-<u>Goldberger</u> courts . . . have generally refused multipliers as high as 2.03.'" Mutual Fund Decision, 2007 U.S. Dist. LEXIS 9450, at *66 (quoting <u>In re Twinlab corp. Sec. Litig.</u>, 187 F. Supp. 2d at 87. <u>See</u> <u>also</u> <u>In re Arakis Energy</u>, No. 95 Civ. 3431, 2001 U.S. Dist. LEXIS 19873, at *51 (E.D.N.Y. Aug. 17, 2001) (stating that an award that was equivalent to a 1.2 multiplier would not "deviate materially from post-<u>Goldberger</u> decisions of courts within the Second Circuit as to whether or not to apply a multiplier to a given lodestar").  Thus, the lodestar multiplier of 2.33

that counsel request in this case bucks the trend among courts after <u>Goldberger</u> refusing to award fees that equate to more than twice counsels' lodestar.

In cross-checking the requested percentage against the lodestar, the Court must "confirm that the percentage amount does not award counsel an exorbitant hourly rate." <u>In re Bristol-Meyers Squibb Sec. Litig.</u>, 361 F. Supp. 2d at 233 (citing <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 187 F.R.D. 465, 486, 489 n.24 (S.D.N.Y. 1998) (internal citations omitted)). Here, as noted above, the requested percentage of 25% of the Settlement Fund translates to a multiple of counsel's lodestar of 2.33 and to an aggregate hourly rate of $1,009. In the Mutual Fund Cases, the Court reduced the requested fee percentage so that the award resulted in a multiplier of 1.95 and an aggregate hourly compensation of $959, which was deemed to be a "princely rate of pay, by any standard" but ultimately reasonable. Mutual Fund Decision, 2007 U.S. Dist. LEXIS 9450, at *78. Similarly, in the Internet Cases, the Court found that a multiplier of 1.985 and an aggregate hourly wage of $913 were reasonable, and in the ML Shareholders Decision, found that a multiplier of 2.02 and an aggregate hourly wage of $946 were reasonable.

Here, too, counsel's fee request must be reduced in order to provide a fair and reasonable fee that translates to a multiplier that is not markedly greater than twice counsels' lodestar and an aggregate hourly wage that is less than $1,000.

*Reasonable Fee Award*

After applying the Goldberger factors and performing the lodestar "cross-check," the Court finds that an award of 22.5% of the Settlement Fund constitutes a reasonable fee. This award will result in a high but not excessive multiplier of 2.09 and an hourly compensation of $908, sums which comport not only with this Circuit's jurisprudence post-Goldberger but also with this Court's awards of fees in the settlements of the related MDL Cases.

**(iv) Reimbursement of Litigation Expenses**

Counsel request reimbursement of $38,139.88 in litigation costs and expenses. Counsel is entitled to reimbursement from the common fund for reasonable litigation expenses. Miltland Raleigh-Durham v. Myers, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) (quoting Reichman v. Bonsignore, Brignati & Mazzotta, P.C., 818 F.2d 278, 283 (2d Cir. 1987)).

Counsels' application is for an amount less than that stated in the notice, which provided that the request

for reimbursement of expenses would not exceed $50,000.

Expenses incurred in litigating this case include such standard items as computer research fees, copying costs, postage, court fees, travel expenses, and professional fees paid to counsels' damages expert and accountant. Each of the law firms has submitted a line-item accounting of expenses incurred during the litigation. No class members have objected to the expenses claimed. The expenses submitted by counsel are reasonable and should be reimbursed in full out of the Settlement Fund.

**CONCLUSION**

For the foregoing reasons, the Court grants certification to the settlement classes and approves the Settlement and Plan of Allocation as fair and reasonable. Plaintiffs' remaining claims are dismissed with prejudice. Counsel are awarded attorneys' fees in the amount of 22.5% of the Settlement Fund and reimbursement of costs and expenses in the amount of $$38,139.88.

The Court will enter an Order and Final Judgment, to be submitted by counsel, confirming and finalizing its approval of the Settlement and its award of fees and expenses consistent with all of the proceedings in this case

and this Opinion and Order. Attorneys' fees and expenses
are to be administered pursuant to the terms of the Order
and Final Judgment. In addition, counsel are permitted to
petition the Court for reimbursement of any additional
reasonable litigation costs and expenses as they are
incurred in this action.

SO ORDERED.
Dated: New York, New York
        April 16 , 2008

                                    _John F. Keenan_
                                    JOHN F. KEENAN
                              United States District Judge